THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**KARTIKA ADAMS**                                                                                          **PLAINTIFF**

**v.**                              **Case No. 4:19-cv-00588-KGB**

**COTTAGE CARE**                                                                                         **DEFENDANT**

**OPINION AND ORDER**

Before the Court is defendant Cottage Care's motion for summary judgment (Dkt. No. 20). Plaintiff Kartika Adams did not respond to Cottage Care's motion, and the time for filing a response has passed. For the following reasons, the Court grants Cottage Care's motion for summary judgment (*Id*).

**I.      Statement Of Facts**

Unless otherwise stated, the facts below are drawn from the Cottage Care's statement of undisputed facts (Dkt. No. 22). These facts are deemed admitted by the Court, as Ms. Adams did not respond to or refute them. Local Rule 56.1(c), *Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas*. In reaching its decision in this case, the Court reviewed all of the record evidence, including but not limited to the entirety of Ms. Adams' deposition (Dkt. No. 20-1).

Ms. Adams began her employment with Cottage Care in its Little Rock, Arkansas, location in 2015, where she worked as a Crewmember cleaning homes for Cottage Care clients (Dkt. No. 22, ¶ 1). Ken Lensing owned and managed Cottage Care's Little Rock location from the beginning of Ms. Adams' employment through the end of 2018 (*Id*., ¶ 2). Mr. Lensing sold the business, and in January 2019, Brandy Tucker took over as manager of Cottage Care's Little Rock operation (Dkt. Nos. 20-2, ¶¶ 2, 4; 22, ¶ 3). Due to this sale and transition in management, all employees,

including Ms. Adams, received, reviewed, and acknowledged Cottage Care policies including its Anti-Harassment Policy, Crewmember Attendance Policy, and the Acknowledgement of Company Policy and Compliance Agreement (Dkt. No. 22, ¶ 3).  The Crewmember Attendance Policy ("Attendance Policy") stated in pertinent part that "[m]orning employees [were] expected to arrive at work each day no later than 8:45 a.m.  Afternoon employees [were] expected to arrive no later than 11:45 a.m." (*Id*., ¶ 4).  The Attendance Policy further required employees to "telephone their immediate supervisor no later than 7:00 a.m. on any day he or she anticipate[d] being late or absent to report the circumstances of such, advising how late he or she may be, regardless of when his or her shift beg[an]" (*Id.*).  Moreover, the Attendance Policy required employees to "request approval for days off at least one week in advance" (*Id.*).  "Failure to [supply Cottage Care with the requisite notice] . . . result[ed] in the absence being recorded as unexcused and [potentially] subject[ed] . . . [the employee to] disciplinary action.  If an employee fail[ed] to report to work for two . . . consecutive days without contacting his or her immediate supervisor[,] . . . the employee . . . [was] presumed to have quit and [was] terminated" (*Id.*).

Ms. Adams testified during her deposition that her schedule varied, but she would typically arrive at the Cottage Care office at 8:30 a.m. each day to get her schedule (*Id.*, ¶ 5).  She testified that, on average, she cleaned houses until approximately 3:30 or 4:00 p.m. each day, Monday through Friday (*Id.*).

As a matter of practice, Ms. Tucker asked that crewmembers make three points of contact with her for each house they cleaned:  once when they arrived at the worksite, once when they were about an hour from completing their job, and once when they had finished cleaning the home (*Id.*, ¶ 6).  Ms. Adams claimed in her complaint, and testified during her deposition, that Ms. Tucker harassed her throughout the workday (Dkt. Nos. 2, ¶ 8; 20-1).  Ms. Adams also

acknowledged that Ms. Tucker's allegedly harassing phone calls related to work because it was important for homeowners to know if Ms. Adams would be running late (Dkt. No. 22, ¶¶ 7–8).

On January 21, 2019, Ms. Tucker texted Ms. Adams at 1:18 p.m. stating, "Hey where are you?" (*Id.*, ¶ 9). At 1:20 p.m., Ms. Tucker followed up, "Haven't heard from you. Customer is calling me" (*Id.*). Ms. Adams replied at 1:26 p.m., "Rapping it up" (*Id.*). Ms. Tucker told Ms. Adams that Ms. Tucker was sending another employee to clean the second house on her schedule because Ms. Adams was supposed to be there between 12:00 and 1:00 p.m. (*Id.*). Ms. Tucker explained, "[w]hen we tell customers we will be there between 12 and 1, we have to honor that. If I would have known you were going to be late, I could have tried to call" (*Id.*).

On February 1, 2019, Ms. Adams texted Ms. Tucker at 9:26 a.m. alerting her to the fact that Ms. Adams could not get into a client's home (*Id.*, ¶ 10). Ms. Tucker told Ms. Adams at 9:29 a.m. that the key was supposed to be under the mat and that Ms. Tucker would call the client (*Id.*). At 9:33 a.m., Ms. Tucker texted Ms. Adams, "Call me" (*Id.*). Ms. Adams did not respond (*Id.*). At 10:09 a.m. Ms. Tucker texted, "Did you get in?" (*Id.*). Ms. Adams did not respond until 10:11 a.m. when she told Ms. Tucker that she could not get in and just left the house (*Id.*). Ms. Adams admitted that she never called Ms. Tucker before leaving the house (*Id.*).

On February 8, 2019, Ms. Tucker texted Ms. Adams at 10:48 a.m., "I need you to call me" (*Id.*, ¶ 11). At 10:49 a.m., Ms. Tucker added, "ASAP" (*Id.*). At 10:52 a.m., Ms. Tucker followed up, "It's very important that you call me. You are not at the apartment, because I've been there, so where are you? Tika, your second house skipped, and I need you to do something else" (*Id.*). At 10:58 a.m., Ms. Tucker said, "Call the office" (*Id.*). Ms. Adams replied for the first time at 10:59 a.m. stating, "Okay, send the address" (*Id.*).

Ms. Adams testified that for the first two years of her employment, she had a good relationship with Ms. Tucker (*Id.*, ¶ 12). According to Ms. Adams, that changed once Ms. Tucker heard a rumor that Ms. Adams was having an affair with Mr. Lensing, Ms. Tucker's uncle (*Id.*). Ms. Tucker disputes the claim that she is related to Mr. Lensing "in any way" (Dkt. No. 20-2, ¶ 3). Ms. Tucker maintains that her "only relationship to Mr. Lensing was as his Assistant from April 2017 through December 2018" (*Id.*).

As manager, Ms. Tucker assigned work based on employee reliability and quality of service (Dkt. No. 22, ¶ 14). During March 2019, there were several days when there was not sufficient work for all employees and other employees were scheduled ahead of Ms. Adams (*Id.* ¶ 15). This included multiple African American employees who received priority in scheduling over Ms. Adams (*Id.*). On days when Ms. Tucker knew there was not enough work for Ms. Adams, Ms. Tucker would text Ms. Adams as close to 7:30 a.m. as possible letting her know that she did not have any work for Ms. Adams that day (*Id.*, ¶ 16). Ms. Tucker informed Ms. Adams that she did not have any work for Ms. Adams on Friday, March 1; Monday, March 4; Tuesday March, 5; Wednesday, March 6; Thursday, March 7; and Friday, March 8, 2019 (*Id.*, ¶ 17).

On March 13, 2019, Ms. Adams did not report to work (*Id.*, ¶ 18). She did not contact Ms. Tucker or inquire about work at all that day (*Id.*). Ms. Tucker had not texted her that there was no work for her that day (*Id.*).

On March 25, 2019, Ms. Adams texted Ms. Tucker at 11:14 a.m. stating, "[h]aven't heard from u [*sic*] today is there any work" (*Id.*, ¶ 19). Ms. Tucker responded at 11:16 a.m., "[t]here was work, but we start at 830 and I had to have someone else cover it" (*Id.*). Ms. Adams did not report to work or otherwise notify Ms. Tucker that she was unavailable for work on multiple occasions (*Id.*).

On March 28, 2019, Ms. Adams did not report for work (*Id.*, ¶ 20). Ms. Adams texted Ms. Tucker at 11:49 a.m. stating, "Is there any work tomorrow or Friday" (*Id.*). Ms. Tucker responded that she did not yet know about work for the following day because she had not heard from all the customers scheduled for that day (*Id.*). Ms. Tucker told Ms. Adams that she had work that day for her, but Ms. Adams had not texted Ms. Tucker until almost noon (*Id.*).

On Friday, March 29, 2019, Ms. Adams did not report for work (*Id.*, ¶ 21). At 10:33 a.m., Ms. Adams texted Ms. Tucker, "U [*sic*] guess you still don't know if there is any work or not" (*Id.*). Ms. Tucker responded, "Its [*sic*] 10:34, you told me yesterday you didn't show you would see me today. I only text people when I don't need them, this is your 3rd no call no show" (*Id.*). Ms. Tucker further stated, "Everyone comes to work every day unless you get a text by 730. Its [*sic*] always been that way. I never said you did not have work today or yesterday" (*Id.*). Ms. Tucker also instructed Ms. Adams to review her employee handbook regarding this policy and explained, "On 3 different occasions you did not show for work. Work starts at 830, that is the time employees are scheduled to be at cottagecare [*sic*]. You didn't show and/or call on 2 of those occasions. Yesterday you texted me at noon. 4 hours past time to be here" (*Id.*).

Based on this series of events, and her prior failures to follow Cottage Care policy, Ms. Tucker decided she would no longer use Ms. Adams to clean houses as of March 29, 2019 (*Id.*, ¶ 22). On June 17, 2019, Ms. Tucker texted Ms. Adams outlining many of the instances since January 2019 in which Ms. Adams had failed to comply with Cottage Care policy (*Id.*, ¶ 23). Ms. Tucker explained, "[d]ue to unreliability, not coming in on time, and the inability to comply with office policies, we considered the professional relationship ended on March 29, 2019" (*Id.*).

Ms. Adams filed this lawsuit in response to her firing on August 21, 2019 (Dkt. No. 2). She alleged that Cottage Care and Ms. Tucker violated the Civil Rights Act (*Id.*, ¶¶ 1, 3, 8). On

November 23, 2020, Ms. Tucker filed a motion to dismiss for failure to state a claim against her (Dkt. No. 8). The Court granted that motion on September 13, 2021, and noted that the claim against Cottage Care remained pending (Dkt. No. 19). Cottage Care filed its motion for summary judgment on October 14, 2021 (Dkt. No. 20).

## II.     Legal Standard For Summary Judgment

Pursuant to the Federal Rules of Civil Procedure, the Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if a reasonable jury could render its verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). Mere denials or allegations are insufficient to defeat an otherwise properly supported motion for summary judgment. *See Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008); *Com. Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271–72 (8th Cir. 1992).

First, the burden is on the party seeking summary judgment to demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019). If the moving party satisfies its burden, the burden then shifts to the non-moving party to establish the presence of a genuine issue that must be determined at trial. *See Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Matsushita*,

475 U.S. at 586–87). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

There is no discrimination case exception whereby courts should "seldom" or "sparingly" grant summary judgment. *Torgerson*, 643 F. 3d at 1043. Supreme Court precedent requires district courts to "treat discrimination [no] differently from other ultimate questions of fact.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 524, (1993) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983))). Thus, courts should review Title VII employment discrimination cases using the same standards as they would in any other case. *Torgerson*, 643 F. 3d at 1043.

### III.   Legal Standards Under Title VII

Ms. Adams claims that Cottage Care violated Title VII of the Civil Rights Act of 1964 ("Title VII") when it, through Ms. Tucker, terminated Ms. Adams' employment based on her race (Dkt. No. 2, ¶ 8–9). 42 U.S.C. § 2000e-2 *et seq.* Ms. Adams also claims that Cottage Care allowed Ms. Tucker to foster and perpetuate a work environment hostile to her as an African American (*Id.*).[1] *Id.*

Title VII makes it illegal for employers to "discharge any individual . . . because of . . . race." 42 U.S.C. § 2000e-2(a)(1). The statute also "prohibits an employer from subjecting its employees to a hostile work environment 'because of such individual's . . . race.'" *Al-Zubaidy v.*

---

[1] The Court understands Ms. Adams to allege that Cottage Care violated Title VII by terminating her employment based on her race and by creating a hostile work environment (Dkt. No. 2, ¶¶ 8–9). As Cottage Care points out in its brief in support of its motion for summary judgment, "it is unclear under what theory [Ms. Adams] claims race discrimination" (Dkt. No. 21, at 10). The Court will proceed with its analysis based on its understanding of Ms. Adams' claims and consistent with the approach taken by Cottage Care in its briefing.

7

*TEK Indus., Inc.,* 406 F.3d 1030, 1038 (8th Cir. 2005) (citing *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116 n.10, (2002)).

To prove a Title VII violation following discharge, a plaintiff must show intentional racial discrimination through direct or indirect evidence. *Putman v Unity Health Sys.*, 348 F.3d 732, 734 (8th Cir. 2003). Direct evidence "establishes 'a specific link between the [alleged] discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the employer's decision." *Putman*, 348 F.3d at 735 (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)); *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (determining that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination"). Because a plaintiff can rarely demonstrate an employer's discriminatory intent with direct evidence, the Supreme Court fashioned a multi-pronged approach in *McDonnell Douglas* which allows plaintiffs to make out claims of discrimination through indirect or circumstantial evidence. *Putman*, 348 F.3d at 735 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).

The *McDonnell Douglas* framework is a three-step burden-shifting evidentiary rule. *Putman*, 348 F.3d at 735. Step one requires the plaintiff to make out a *prima facie* case of intentional discrimination, the elements of which vary depending upon the cause of action. *McDonnell Douglas*, 411 U.S. at 802. Provided the plaintiff can make out the *prima facie* case, the burden of articulating "a legitimate, nondiscriminatory reason" for terminating the employment relationship then shifts to the defendant. *Putman*, 348 F.3d at 735. If the defendant can demonstrate a legitimate reason for its actions, then the plaintiff "must show that the [defendant's]

8

proffered nondiscriminatory reason [for termination] is merely a pretext for unlawful race discrimination." *Id.*

Courts analyze a plaintiff's claim that her workplace is racially hostile using a different framework. *O'Brien v. Dep't. of Agric.*, 532 F.3d 805, 809 (8th Cir. 2008); *Al-Zubaidy*, 406 F.3d at 1038; *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). To make out a claim that an employer violated Title VII by creating a racially hostile work environment, a plaintiff must show that: "(1) he is a member of a protected class, (2) he was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic under Title VII, (4) the harassment affected a term, condition or privilege of employment, and (5) employer liability." *Al-Zubaidy*, 406 F.3d at 1038.

The Court addresses each of these applicable standards as they relate to Ms. Adams' discharge and hostile work environment claims.

### IV. Analysis

#### A. Race Discrimination Claim

Ms. Adams contends that Cottage Care terminated her employment because of her race (Dkt. No. 2, ¶ 8). On the record evidence before the Court, Cottage Care is entitled to summary judgment on Ms. Adams' race discrimination claim under Title VII.

##### 1. Direct Evidence

In her deposition testimony, Ms. Adams maintained that Ms. Tucker, Cottage Care's Little Rock Manager, "doesn't like black people" (Dkt. 20-1, at 178). Ms. Adams claimed that Ms. Tucker, "thinks black people is [*sic*] beneath her . . . [because Ms. Tucker has] never worked with black people before" (*Id*). Ms. Adams pointed to Ms. Tucker's "gestures" and the fact that Ms.

9

Tucker spoke to her and other black employees with a "derogatory" tone to support her assertions (*Id.*, at 178–79).

Mere allegations unrelated to the adverse employment action cannot serve as direct evidence of a Title VII violation. *O'Brien*, 532 F.3d at 981 n.3 (explaining that a "bare assertion and speculation as to [an employer's] motive does not create a genuine issue of material fact."). Moreover, "[f]acially race-neutral statements, without more, do not demonstrate racial animus on the part of the speaker." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006). In *Twymon v. Wells Fargo & Company*, an African American employee sued following her termination, alleging racial animus as the basis for her discharge. *Id*. The *Twymon* plaintiff claimed that her supervisor told her that she was not "Midwest nice" and that she did not "know [her] place." *Id*. The Eighth Circuit refused to "extrapolate racial animus" from those statements because the plaintiff did not provide "any factual support or context" for why those statements demonstrated a negative racial bias. *Id.*

Having reviewed the record evidence in the light most favorable to Ms. Adams, the Court declines to read racial animus into Ms. Tucker's alleged comments and actions. Further, Ms. Adams has not tied Ms. Tucker's alleged comments and actions to the decision to discharge Ms. Adams. As a result, this Court concludes that Ms. Adams has come forward with no direct evidence of racial discrimination.

### 2. *McDonnell Douglas* Analysis

The Court also examines Ms. Adams' claims against Cottage Care under the burden shifting analysis announced in *McDonnell Douglas*. 411 U.S. at 802; *Al-*Zubaidy, 406 F.3d at 1038. Ms. Adams must first make out a *prima facie* case of intentional discrimination. *Putman*, 348 F.3d at 735. If Ms. Adams can make out the elements of the *prima facie* case, Cottage Care

then must come forward with "a legitimate nondiscriminatory reason" for her discharge. *Id.* Ms. Adams then must challenge Cottage Care's "proffered nondiscriminatory reason" for termination as "a pretext for unlawful race discrimination." *Id.*

The Court determines on the record evidence before it, even with all reasonable inferences drawn in Ms. Adams' favor, no reasonable juror could conclude that Ms. Adams can establish a *prima facie* case of racial discrimination. Furthermore, even if Ms. Adams could establish a *prima facie* case, on the record evidence before the Court she fails to show that a reasonable juror could conclude that Cottage Care's actions were a pretext for racial discrimination. Cottage Care is entitled to summary judgment in its favor on this claim.

### a. *Prima Facie* Case Of Discriminatory Termination

To establish a *prima facie* case of racial discrimination under Title VII based on her discharge, Ms. Adams must demonstrate that: (1) she is a member of a protected class; (2) she was performing her job at a level that met the employer's legitimate expectations; (3) the employer discharged her; and (4) that the circumstances of her employment or adverse employment action give rise to an inference of discrimination. *Ghane v. West*, 148 F.3d 979, 981 n.3 (8th Cir. 1998); *see also Taylor v. Sw. Bell Tel. Co.*, 251 F.3d 735, 740 (8th Cir. 2001); *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 427 (8th Cir. 1999); *see generally Putman*, 348 F. 3d at 736.

Cottage Care does not dispute that Ms. Adams is a member of a protected class or that it discharged her (Dkt. No. 21, at 11–15). Cottage Care, however, maintains that Ms. Adams did not meet its legitimate employment expectations during her employment (*Id.*, at 12–13). It also contends that Ms. Adams "cannot demonstrate facts permitting an inference of race discrimination" (*Id.*, at 13–14). Having reviewed the record evidence in the light most favorable

to Ms. Adams, the Court agrees with Cottage Care.  Ms. Adams has not and cannot satisfy the second and fourth elements of the *prima facie* case for racial discrimination.

Ms. Adams maintains that she met Cottage Care's employment expectations and was "ready and available to work" (Dkt. No. 2, ¶¶ 8–9).  Ms. Adams argues that Ms. Tucker harassed her with multiple phone calls a day and wanted to "get rid of" Ms. Adams for non-legitimate reasons (*Id.*).  Cottage Care, on the other hand, characterizes Ms. Adams as an employee who disregarded company policy on multiple occasions (Dkt. No. 21, at 12–13).

Cottage Care laid out its employment expectations and company policies in a series of documents signed by Ms. Adams on January 2, 2019 (Dkt. No. 20-1, at 190–97).  Specifically, the Cottage Care Attendance Policy is significant in this case (*Id.*, at 196).  The Attendance Policy explains when employees are to arrive to work, the deadline for informing their supervisor about unplanned absences, and the consequences of not adhering to the Attendance Policy (*Id.*).  Moreover, as a matter of practice, Ms. Tucker required Cottage Care employees to make three points of contact with her per each house cleaned (Dkt. No. 22, ¶ 6).

The undisputed facts before the Court indicate that Ms. Adams knew of these requirements and frequently disregarded them (*Id.*, at 7–11, 18–21).  Ms. Adams did not communicate the progress of her cleaning projects on one or more occasions (Dkt. Nos. 20-2, ¶ 11; 22, ¶ 6).  She walked away from an appointment without calling her supervisor after she could not find the key to the client's home and skipped another appointment a week later (Dkt. No. 22, at 10–11).  Subsequently, Ms. Adams did not report for work on time on multiple occasions (*Id.*, at 18–21).  On the record evidence before the Court, the Court determines that no reasonable juror could conclude that Ms. Adams met Cottage Care's legitimate expectations.  For these reasons, the Court determines that no reasonable juror could find in favor of Ms. Adams on the second element of the

*prima facie* case of intentional discrimination under the *McDonnel Douglas* burden-shifting framework.

Ms. Adams also cannot meet the requirements of the fourth element of the *prima facie* case, as she cannot demonstrate facts that permit an inference of racial discrimination based on the record evidence. Ms. Adams makes the bare assertion that Ms. Tucker harassed her and laid her off after making discriminatory comments (Dkt. No. 2, ¶ 8). Ms. Adams also claims that Ms. Tucker wanted to "get rid of [her] for [Ms. Tucker's] own personal reasons" (*Id.*, ¶ 9). In assessing these allegations, the Court has reviewed all of the record evidence presented and construed all reasonable inferences in favor of Ms. Adams. All of the statements and conduct alleged by Ms. Adams, without more, does not create an inference of racial discrimination. *See generally Twymon*, 462 F.3d at 934.

Cottage Care points out in its brief in support of its motion for summary judgment that the "only comment Plaintiff cited regarding race was Tucker's alleged statement that she had never worked with black people" (Dkt. No. 21, at 14). Even if the Court accepts Ms. Adams' allegations as true, the Eighth Circuit has held that "stray comment[s]," such as these, do not amount to an inference of racial discrimination. *Arraleh v. County of Ramsey*, 461 F.3d 967, 971, 973 (8th Cir. 2006). For example, in *Arraleh v. County of Ramsey*, a plaintiff claimed that an employer did not hire him because he was a black Muslim. 461 F.3d at 973. The *Arraleh* plaintiff pointed to the fact that a supervisor once said that black employees should "leave their blackness behind" as evidence of racial discrimination. *Id.* at 974. The Eighth Circuit concluded that the plaintiff failed to show the necessary "context" that could link the statement with the adverse employment decision. *Id.* at 975. The Court concluded that the comment, at most, constituted "an ambiguous statement by a decisionmaker unrelated to the decisional process" from which no reasonable fact

13

finder could infer a racially impermissible motivation. *Id.* Like the *Arraleh* case, Ms. Tucker's comments regarding the racial makeup of her previous work environments, without more, does not permit an inference that Cottage Care terminated Ms. Adams' employment for an impermissible reason

In fact, instead of providing the Court with a link between the above comment and her termination, Ms. Adams points the Court to her rumored affair with Mr. Lensing as the basis for her termination (Dkt. No. 22, ¶¶ 12–13). Ms. Adams' inability to provide the Court with some link between Ms. Tucker's alleged statement that she has no experience working with African Americans and Ms. Adams' subsequent termination leads the Court to determine that no reasonable juror could infer a racially impermissible motivation for Ms. Adams' termination.

b. **Legitimate Nondiscriminatory Reason For Termination**

Even if Ms. Adams could establish the elements of the *prima facie* case, Cottage Care has articulated a legitimate nondiscriminatory reason for her termination. *McDonnel Douglas*, 411 U.S. at 802–03; *Putman*, 348 F. 3d at 736. Cottage Care maintains that it terminated Ms. Adams due to her failure to show up for work and her unwillingness to follow company policy (Dkt. No. 22, ¶¶ 6, 10–11, 18–21). *See generally Al-Zubaidy*, 406 F. 3d at 1037 (finding that an employee's excessive absenteeism is a "legitimate, nondiscriminatory reason for discharge"); *Putman*, 348 F. 3d at 736 (determining that an employee refusing to obey a direct order was "a clear cut, legitimate, nondiscriminatory reason for terminat[ion]").

c. **Evidence Of Pretext**

Because Cottage Care has articulated a "legitimate nondiscriminatory reason for discharge," Ms. Adams must demonstrate that Cottage Care's reason is merely a pretext for intentional discrimination. *Al-Zubaidy*, 406 F.3d at 1037; *see also Putman*, 348 F. 3d at 736. She

cannot meet this burden. On the record evidence, even with all reasonable inferences construed in favor of Ms. Adams, no reasonable juror could conclude that Ms. Adams has demonstrated that Cottage Care's justification for her termination is a pretext for intentional racial discrimination.

In the instant case, Ms. Adams claims that Cottage Care terminated her employment based on her race and the fact that she was supposedly having an affair with her supervisor's alleged relative (Dkt. Nos. 2, ¶ 8–9; 20-1, at 166). Ms. Adams herself provides another reason for her firing unrelated to race – an alleged affair with her supervisor's supposed uncle (Dkt. No. 20-1, at 166). Additional reasons for an adverse employment action unrelated to the Title VII claim do not bolster a claim for discrimination in the Eighth Circuit. *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1337 (8th Cir. 1996). Rather, they "completely refute" claims of discrimination. *Id.* Ms. Adams provides insufficient evidence of racial animus on the part of her supervisor tied to her termination, and the claim about the alleged affair weakens, rather than strengthens, her argument. Even viewing all record evidence in her favor, Ms. Adams cannot show that Cottage Care's actions were a pretext for racial discrimination. As such, her wrongful termination claim under Title VII fails. *See generally Al-Zubaidy*, 406 F. 3d at 1037; *see also Putman*, 348 F. 3d at 736.

For these reasons, Cottage Care is entitled to summary judgment in its favor on Ms. Adams' race discrimination claim.

### B.    Hostile Work Environment Claim

The Court also understands Ms. Adams' complaint to allege that Cottage Care violated Title VII by creating a hostile work environment based on race (Dkt. No. 2, ¶ 8–9). Employers violate Title VII when they require their employees "to work in a discriminatorily hostile or abusive environment." *Harris*, 510 U.S. at 21. A plaintiff establishes a hostile work environment claim by showing that: (1) she is a member of a protected class, (2) she was subject to unwelcome

harassment, (3) the harassment was based on the characteristic protected by Title VII, (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer is liable. *Al-Zubaidy*, 406 F. 3d at 1038 (citing *Willis v. Henderson*, 262 F.3d 801, 808 (8th Cir. 2001)). Cottage Care does not dispute that Ms. Adams is a member of a protected class. For this reason, the Court proceeds to the remaining four factors to determine whether Ms. Adams can establish a hostile work environment claim against Cottage Care. *Id.*

The federal harassment standard under Title VII demands plaintiffs show "extreme" conduct that is subjectively and objectively abusive. *Harris*, 510 U.S. at 21. The plaintiff must "subjectively perceive the environment to be abusive," and the environment must be sufficiently intimidating or offensive such that a reasonable person would find the workplace conditions hostile or abusive. *Id.* Complainants satisfy the subjectivity prong by demonstrating that they perceived a demonstrably abusive workplace. *Id.* Courts determine whether conduct is objectively "severe or pervasive to alter the conditions of . . . employment" by looking at the totality of the circumstances. *Faragher v. City of Boca Raton*, 524 U.S. 775, 777–88 (1998) (citing *Harris*, 510 U.S. at 23). Isolated incidents, "simple teasing," or "mere utterance[s] of an . . . epithet which engenders offensive feelings in an employee" do not rise to the level of harassment necessary to deem a workplace hostile under Title VII. *Faragher*, 524 U.S. at 777–88.

Viewing the record evidence in the light most favorable to Ms. Adams, the Court concludes that Ms. Adams fails to meet the objective requirement of her hostile work environment claim. *See generally Faragher*, 524 U.S. at 787–88; *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998); *Harris*, 510 U.S. at 21. The Supreme Court has cautioned lower courts that Title VII cannot be read to be a "general civility code." *Oncale*, 523 U.S. at 80. Workplaces become objectively hostile when the environment is "so heavily polluted with discrimination as to

destroy completely the emotion and psychological stability of minority group workers." *Harris*, 510 U.S. at 22 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). On the other hand, "verbal harassment and increased scrutiny" are not actionable under Title VII. *O'Brien*, 532 F.3d at 809. While it is true that such harassment and scrutiny may lead the employee to deem her work environment "frustrating," such frustrations do not violate Title VII because they do not affect a term, condition, or privilege of employment. *Bradley v. Widnall*, 232 F.3d 626, 631–32 (8th Cir. 2000) (determining that an employee who was disrespected, subjected to false complaints, and cut out of key decisions faced a frustrating rather than hostile work environment); *see also Austin v. Minnesota Min. & Mfg. Co.,* 193 F.3d 992, 994 (8th Cir.1999) (concluding that distributing an employee's test results and posting an offensive flyer did not create a hostile work environment); *Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 965–67 (8th Cir.1999) (holding that "unpleasant conduct and rude comments" . . . were not "severe or pervasive" enough to "alter the conditions of employment and create a hostile work environment in violation of Title VII"). Even accepting all of Ms. Adams' allegations as true, they fail to meet the actionable standard for hostile work environment given controlling Eighth Circuit precedent.

For these reasons, Cottage Care is entitled to summary judgment in its favor on Ms. Adams' hostile work environment claim.

## V. Conclusion

The Court, after analyzing the applicable legal standards and looking at all of the record evidence in the light most favorable to Ms. Adams, concludes that Cottage Care is entitled to summary judgment in its favor on Ms. Adams' claims. The Court grants Cottage Care's motion for summary judgment (Dkt. No. 20). The relief requested is denied.

It is so ordered this 12th day of September, 2022.

*Kristine G. Baker*
Kristine G. Baker
United States District Judge